**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| BEN E. KNOX, | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. H-08-2021 |
| | § | |
| MICHAEL J. ASTRUE, | § | |
| COMMISSIONER OF SOCIAL | § | |
| SECURITY, | § | |
| Defendant. | § | |

**MEMORANDUM AND RECOMMENDATION ON**
**CROSS-MOTIONS FOR SUMMARY JUDGMENT**

This matter was referred by United States District Judge Lee H. Rosenthal, for full pre-trial management, pursuant to 28 U.S.C. § 636(b)(1)(A) and (B).  (Docket Entry #3).  Cross-motions for summary judgment have been filed by Plaintiff Ben Knox ("Plaintiff," "Knox") and by Defendant Michael J. Astrue ("Defendant," "Commissioner"), in his capacity as Commissioner of the Social Security Administration ("SSA").  (Plaintiff's Motion for Summary Judgment ["Plaintiff's Motion"], Docket Entry #13; Defendant's Motion for Summary Judgment, and Memorandum in Support of Motion for Summary Judgment ["Defendant's Motion"], Docket Entries #11, #12).  Each party has also filed a response to the competing motions.  (Plaintiff's Response, Docket Entry #15; Defendant's Response, Docket Entry #14).  After considering the pleadings, the administrative transcript, and the applicable law, it is RECOMMENDED that Plaintiff's Motion be GRANTED, and that Defendant's Motion be DENIED.  It is also RECOMMENDED that this case be remanded for further development on the issue of Plaintiff's mental impairments, as set out in this memorandum.

## Background

In September, 2004, Plaintiff Ben Knox filed applications for Social Security Disability Insurance Benefits ("DIB"), under Title II of the Social Security Act ("the Act"), and for Supplemental Security Income ("SSI"), under Title XVI of the Act.[1]  (Transcript ["Tr."] at 107-12). In his applications, Knox claimed that he had been unable to work since August 1, 2004, as a result of "[h]eat strokes."  (Tr. at 107, 110, 146).  The SSA denied the applications on December 13, 2004, finding that Knox is not disabled under the Act.  (Tr. at 92-98).  On January 27, 2005, Plaintiff petitioned for a reconsideration of that decision, and he included a new allegation, that he was suffering from depression.  (Tr. at 90).  The SSA had his case independently reviewed, but again denied him benefits, on November 17, 2005.  (Tr. at 85-89).

On December 28, 2005, Plaintiff requested a hearing before an administrative law judge ("ALJ").  (Tr. at 82).  The initial hearing, before ALJ Ray McQuary, took place on February 13, 2007.  (Tr. at 429).  Plaintiff appeared without an attorney or other legal representative, and he testified in his own behalf.  (Tr. at 430-32).  In addition, a friend, Bernitha Lewis ("Ms. Lewis"), testified about Knox's condition.  (Tr. at 432-33).  The ALJ also heard testimony from Dr. Giao Hoang ("Dr. Hoang"), an internist, and Kate Gilreath, a vocational expert.  (Tr. at 429-32).  At the conclusion of the testimony, the ALJ decided to continue the hearing at a later date so that he could obtain the opinion of a mental health expert.  (Tr. at 24).  He also gave Plaintiff the opportunity to submit additional evidence on his mental state.  (Tr. at 24, 452-54).  On July 26, 2007, ALJ McQuary conducted what he called the "supplemental" hearing, and at that time, he solicited

---

[1] While the rules governing DIB and SSI differ, an applicant seeking either benefit must first prove that he is "disabled" within the meaning of the Act.  *See* 42 U.S.C. §§ 423(d), 1382c(a)(3) and (a)(3)(G); 20 C.F.R. §§ 404.1505(a), 416.905(a); *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994).

testimony about Knox's mental state and his apparent history of alcohol and drug abuse.  (Tr. at 455-58, 485).  Knox and Ms. Lewis again appeared and testified.  (Tr. at 455-57).  In addition, the ALJ heard testimony from Dr. Daniel Hamill ("Dr. Hamill"), a clinical psychologist, and from another vocational expert, Cheryl Swisher[2] ("Ms. Swisher").  (*Id.*).

Following the second hearing, the ALJ engaged in the following five-step, sequential analysis to determine whether Plaintiff was capable of performing substantial gainful activity or was, in fact, disabled:

1. An individual who is working or engaging in substantial gainful activity will not be found disabled regardless of the medical findings.  20 C.F.R. §§ 404.1520(b) and 416.920(b).

2. An individual who does not have a "severe impairment" will not be found to be disabled.  20 C.F.R. §§ 404.1520(c) and 416.920(c).

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will not be considered disabled without consideration of vocational factors.  20 C.F.R. §§ 404.1520(d) and 416.920(d).

4. If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.  20 C.F.R. §§ 404.1520(e) and 416.920(e).

5. If an individual's impairment precludes performance of his past work, then other factors, including age, education, past work experience, and residual functional capacity must be considered to determine if any work can be performed.  20 C.F.R. §§ 404.1520(f) and 416.920(f).

*Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000); *Martinez v. Chater*, 64 F.3d 172, 173-74 (5th Cir. 1995); *Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991); *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991); *Harrell v. Bowen*, 862 F.2d 471, 475 (5th Cir. 1988).  It is well settled that, under this analysis, Knox has the burden to prove any disability that is relevant to the first four steps.  *See*

---

[2] In his written decision, the ALJ incorrectly identifies Ms. Swisher as "Cecile Johnson."  (*See* Tr. at 24; *but see* Tr. at 486).

*Wren*, 925 F.2d at 125.  If he is successful, the burden then shifts to the Commissioner, at step five, to show that he is able to perform other work that exists in the national economy.  *See Myers v. Apfel*, 238 F.3d 617, 619 (5th Cir. 2001); *Wren*, 925 F.2d at 125.

Generally, "[a] finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis." *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).  However, if a claimant is found to be disabled, but there is evidence that he is addicted to drugs or alcohol, the ALJ must also determine whether substance abuse is a "contributing factor material to the determination of disability."   42 U.S.C. § 1382c(a)(3)(J); *accord* 20 C.F.R. § 404.1535(a).  Substance abuse is a material contributing factor if, in its absence, the claimant's "remaining limitations would not be disabling." *Id*. at § 404.1535(b)(2)(i).  If it is found to be a material contributing factor, then the claimant is not considered to be disabled, and he is ineligible to receive benefits. *See* 42 U.S.C. § 1382c(a)(3)(J).  The burden to prove that substance abuse is not a contributing factor material to his disability lies with the claimant. *See Brown v. Apfel*, 192 F.3d 492, 498 (5th Cir.1999).

It must be emphasized that the mere presence of an impairment does not necessarily establish a disability. *See Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992) (quoting *Milam v. Bowen*, 782 F.2d 1284, 1286 (5th Cir. 1986)).  An individual seeking benefits under the Act has the burden to prove that he suffers from a disability. *See Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988); *Cook v. Heckler*, 750 F.2d 391, 393 (5th Cir. 1985).  Under the Act, a claimant is deemed disabled only if he demonstrates an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than twelve months."

4

*Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990) (citing 42 U.S.C. § 423(d)(1)(A)).  Substantial

gainful activity is defined as "work activity involving significant physical or mental abilities for pay

or profit."  *Newton*, 209 F.3d at 452.  A physical or mental impairment is "an impairment that results

from anatomical, physiological or psychological abnormalities which are demonstrable by medically

acceptable clinical and laboratory diagnostic techniques."  *Hames v. Heckler*, 707 F.2d 162, 165 (5th

Cir. 1983) (citing 42 U.S.C. § 423(d)(3)).  Further, the impairment must be so severe as to limit the

claimant so that he is "not only unable to do [his] previous work but cannot, considering [his] age,

education, and work experience, engage in any kind of substantial gainful work which exists in the

national economy."  *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994) (citing 42 U.S.C.

§ 423(d)(2)(A)).

Based on these principles, as well as his review of the evidence of record, the ALJ

determined that Knox suffers from "a seizure disorder,[3] schizophrenia,[4] and a substance abuse

disorder,"[5] and that those impairments are "severe." (Tr. at 27).  He also found that his impairments,

alone or in combination, "medically equal" Listing 12.03 of the applicable regulations.  (*Id.*).

However, because Knox has a history of substance abuse, the ALJ also considered whether that is

a "contributing factor material to the determination of" his disability.  (Tr. at 28-35).  The ALJ found

that, even if Knox did not have a substance abuse problem, his other impairments would qualify as

---

[3]  A "seizure" is "a hyperexcitation of neurons in the brain leading to a sudden, violent involuntary series of contractions of a group of muscles." MOSBY'S MEDICAL, NURSING, & ALLIED HEALTH DICTIONARY 1468 (5th ed. 1998).

[4]  "Schizophrenia" is "any one of a large group of *DSM-IV* psychotic disorders characterized by gross distortion of reality, disturbances of language and communication, withdrawal from social interaction, and disorganization and fragmentation of thought, perception, and emotional reaction." *Id*. at 1456.

[5]  The term "substance abuse" refers to "an overindulgence in and dependence on a stimulant, depressant, or other chemical substance, leading to effects that are detrimental to the individual's physical or mental health, or the welfare of others." *Id*. at 1559.

"severe."  (Tr. at 28).  However, he concluded that, absent substance abuse, none of Knox's remaining impairments, alone or in combination, would meet or equal Listing 12.03 or any other listed impairment.  (*Id*.).  The ALJ next found that, regardless of substance abuse, Knox is unable to perform his past relevant work as a "recycling plant worker."  (Tr. at 33).  He then determined that, if Knox was not a substance abuser, he would have "the residual functional capacity to perform medium work," with a few restrictions.  (Tr. at 29).  The ALJ found that there are a significant number of jobs in the national economy that Knox could perform, and, so, absent substance abuse, he would not be considered disabled.  (Tr. at 33).  He then found that, because Knox would not be disabled if he were no longer abusing drugs, his substance abuse disorder "is a contributing factor material to the determination of disability."  (Tr. at 34).  As a consequence, he concluded that Knox "has not been disabled within the meaning of the Social Security Act at any time from the alleged onset date through the date of this decision."  (*Id*.).

On September 18, 2007, Plaintiff requested an Appeals Council review of the ALJ's decision.  (Tr. at 19).  Attorneys at the law firm of Binder and Binder agreed to represent Knox, and the Appeals Council granted additional time to submit further argument or evidence.  (Tr. at 15-18). The Council accepted new evidence from Dr. Stephanie Sim ("Dr. Sim"), a psychiatrist, that purported to show that Knox was disabled.  (Tr. at 12, 428).  SSA regulations provide that the Appeals Council will grant a request for a review if any of the following circumstances is present: "(1) there is an apparent abuse of discretion by the ALJ; (2) an error of law has been made; (3) the ALJ's action, findings, or conclusions are not supported by substantial evidence; or (4) there is a broad policy issue which may affect the public interest."  20 C.F.R. §§ 404.970 and 416.1470.  On February 7, 2008, the Appeals Council denied Plaintiff's request for review, finding that no

applicable reason for review existed.  (Tr. at 9-11).  With that ruling, the ALJ's findings became

final.  *See* 20 C.F.R. §§ 404.984(b)(2) and 416.1484(b)(2).  On February 24, 2008, Knox filed this

suit, pursuant to section 205(g) of the Act (codified as amended at 42 U.S.C. § 405(g)), to challenge

that decision.  (Plaintiff's Complaint ["Complaint"], Docket Entry #1).  Subsequently, the parties

filed cross-motions for summary judgment. After considering the pleadings, the administrative

transcript, and the applicable law, it is recommended that Plaintiff's motion be granted, that

Defendant's motion be denied, and that this case be remanded, for further development on the issue

of Plaintiff's mental impairments, as set out in this memorandum.

**Standard of Review**

Federal courts review the Commissioner's denial of disability benefits only to ascertain

whether the final decision is supported by substantial evidence and whether the proper legal

standards were applied.  *See Newton*, 209 F.3d at 452 (citing *Brown*, 192 F.3d at 496).  "If the

Commissioner's findings are supported by substantial evidence, they must be affirmed." *Id*. (citing

*Martinez*, 64 F.3d at 173).  "Substantial evidence is such relevant evidence as a reasonable mind

might accept to support a conclusion.  It is more than a mere scintilla and less than a

preponderance." *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995); *see Martinez*, 64 F.3d at 173

(quoting *Villa v. Sullivan*, 895 F.2d 1019, 1021-22 (5th Cir. 1990)).  On review, the court does not

"reweigh the evidence, but . . . only scrutinize[s] the record to determine whether it contains

substantial evidence to support the Commissioner's decision." *Leggett v. Chater*, 67 F.3d 558, 564

(5th Cir. 1995); *see Fraga v. Bowen*, 810 F.2d 1296, 1302 (5th Cir. 1987).  In making this

determination, the court must weigh the following four factors:  the objective medical facts; the

diagnoses and opinions from treating physicians on subsidiary questions of fact; Plaintiff's own

testimony about his condition; and Plaintiff's educational background, work history, and present age. *See Wren*, 925 F.2d at 126.  If no credible evidentiary choices or medical findings exist that support the Commissioner's decision, then a finding of no substantial evidence is proper.  *See Johnson*, 864 F.2d at 343.

**Discussion**

Before this court, Plaintiff challenges the ALJ's findings on a number of grounds, each of which relates to his mental condition.  First, he argues that the ALJ erred because he failed to give the proper weight to the opinions of the treating physicians about his mental status.  (Plaintiff's Motion at 6-9).  Next, he claims that the ALJ erred in finding that his mental impairments did not equate to SSA Listing 12.03.  (*Id*. at 6, 11-12).  Knox also claims that the ALJ erred because he failed to properly develop the record regarding an alleged brain injury that caused his mental impairments.  (*Id*. at 6, 12-13).  Further, he argues that "new and material evidence submitted to the Appeals Council affirmed the severity of the Plaintiff's mental impairments."  (*Id*. at 6).  In his response to Defendant's summary judgment motion, Plaintiff adds two additional claims.  (Plaintiff's Response at 1-3).  In the first, he complains that the ALJ failed to properly evaluate his credibility as to his mental impairments.  (*Id*. at 2).  In the other, Plaintiff argues that the ALJ erred because he failed to include the entirety of his mental limitations in posing hypothetical questions to the vocational expert witness.  (*Id*. at 3).  Defendant insists, however, that the ALJ properly considered all of the available evidence, and followed the applicable law, in determining that Plaintiff is not disabled.  (Defendant's Motion at 4-10; Defendant's Response at 1-5).

***Medical Facts, Opinions, and Diagnoses***

The earliest medical records show that Knox was treated at Ben Taub General Hospital, on a regular basis, beginning May 27, 2004.  (Tr. at 222-44, 332-89).  Some of these records are not relevant to this case, because they merely document emergency room visits for minor injuries or illnesses.  (*See, e.g.*, Tr. at 235-44).  However, at one of these visits, on May 29, 2004, Dr. William McKay ("Dr. McKay"), a specialist in emergency medicine, noted that Knox claimed to have used cocaine as recently as one month earlier.  (Tr. at 237).  On June 17, 2004, Knox returned to Ben Taub, complaining of dizziness, shortness of breath, and muscle cramping that occurs when he works in the heat. (Tr. at 387).  Dr. Bernice Blumenreich ("Dr. Blumenreich"), a family practitioner, instructed Knox to "stay well hydrated," and to follow-up in two weeks for a blood pressure check. (*Id.*).  On August 18, 2004, Knox went to the emergency room at Memorial Hermann Hospital, complaining of the same symptoms.  (Tr. at 195).  He was given a differential diagnosis of heat exhaustion, heat cramps, and a sensory deficiency in his right side.  (*Id.*).  A noncontrast CT scan of Knox's brain was taken, and the results were reported to be "consistent with a Chiari type I malformation."[6]  (Tr. at 201).  Although Knox was observed to be otherwise normal, mentally and physically, he was referred to Ben Taub's neurology clinic, where he was treated by two neurologists, Dr. M. Samah ("Dr. Samah"), and Dr. Melissa Ramocki ("Dr. Ramocki").  (Tr. at 195, 224, 227-34).

---

[6] A "Chiari malformation," also known as an "Arnold-Chiari malformation," is a "congenital herniation of the brainstem and lower cerebellum through the foramen magnum into the cervical vertebral canal."  *Id.* at 123.  "In Chiari malformation type I, signs and symptoms usually appear during late childhood or adulthood." MayoClinic.com, *http://www.mayoclinic.com/health/ chiari-malformation/ DS00839/DSECTION=symptoms* (Sept. 8, 2009).  Common symptoms of a type I malformation include severe headaches, neck pain, unsteady gait, poor fine motor skills, numbness and tingling in hands and feet, dizziness, difficulty swallowing, vision problems, and slurred speech.  *Id.*  Less common symptoms include chest pain, tinnitus, and abnormal breathing during sleep.  *Id.*

On October 28, 2004, Knox went to Dr. Samah, complaining of headaches, dizziness, and blurred vision.  (Tr. at 224).  Knox informed Dr. Samah that he had suffered from seizure-type "episodes" since the 1980s, which he believed resulted from head trauma after he was hit by a car and thrown 38 feet.  (*Id.*).  Knox reported that these "episodes" include heavy perspiration; lightheadedness; dizziness; "shakiness"; nausea; weakness and swelling on the right side of his body; and slurred speech.  (*Id.*).  Knox also reported that when these episodes occur, "people ask him, 'Are you all right?  What's wrong,' and he sits down for a few minutes and then the symptoms resolve."  (*Id.*).  He further reported that "[p]rior to the episode he feels scared and like something bad is going to happen," but that he "feels better after the episode."  (*Id.*).  Dr. Samah observed that Knox was oriented to person, place, and time, but that he was a "poor historian."  (*Id.*).  Dr. Samah also noted that a recent CT scan suggested that Knox might have a Chiari type I malformation, but that an MRI taken at nearly the same time did not show it.  (*Id.*).  Dr. Samah ordered blood tests, an EEG, another MRI, and prescribed blood pressure medicine.  (Tr. at 224, 226, 234).  The blood tests showed that Knox was positive for hepatitis C.[7]  (Tr. at 231, 233).  The results of the EEG and the MRI were normal.  (Tr. at 226, 228).  Dr. Samah diagnosed Knox as suffering from hypertension and "likely complex partial seizures."  (Tr. at 224).  A record dated October 30, 2004, notes that Knox has a history of cocaine abuse.  (Tr. at 228).  On December 21, 2004, and February 21, 2005, Knox reported that he was beginning to feel better, but physicians at Ben Taub confirmed the diagnoses of seizure disorder, hepatitis C, and hypertension.  (Tr. at 380-81).

---

[7] "Hepatitis" is "an inflammatory condition of the liver."  MOSBY'S at 752.  "Hepatitis C" is "a type of hepatitis transmitted largely by blood transfusion or percutaneous inoculation, as when intravenous drug users share needles." *Id.* at 753.

On May 17, 2005, Knox was evaluated by Dr. J. Gregory Ryan ("Dr. Ryan"), a psychologist, on behalf of the state.  (Tr. at 245-49).  Dr. Ryan noted that Knox "presented with a history of cognitive decline associated with a head injury."  (Tr. at 248).  He observed that, when he arrived, Knox had a fair appearance, but that he avoided eye contact, and only a minimal rapport was established.  (Tr. at 246-47).  Dr. Ryan stated that Knox's "speech was halting" and sometimes slurred, that his mood and affect reflected "annoyance and impatience," and that his "[s]tream of mental activity appeared delayed."  (Tr. at 247).  In addition, he found Knox to be "oriented times one."  (*Id.*).  He reported that Knox claimed not to remember such things as the date or the day of the week, or the name of the president of the United States, the governor of Texas, or the mayor of Houston.  (*Id.*).  Nor did he remember his own age, or the year of his birth.  (*Id.*).  Dr. Ryan stated that Knox did not try to recite the alphabet or a series of numbers, and that he was unable to perform simple arithmetic, or interpret common proverbs.  (*Id.*).  Dr. Ryan then made the following observation:

> During the evaluation, Mr. Knox was minimally compliant and cooperative overall. He demonstrated a poor level of effort and motivation.  His skills appeared deficient in several key areas.  His presented attention span and ability to concentrate appeared unremarkable.  Overall, he understood the instructions given to him.

(*Id.*).

Dr. Ryan also assessed Knox's intelligence quotient ("IQ"),[8] using the Wechsler Adult Intelligence Scale-III ("WAIS-III").[9]  (*Id.*).  The test revealed a verbal IQ score of 50, a performance

---

[8] An "IQ" is defined as "a numeric expression of a person's intellectual level as measured against the statistical average of his or her age group."  *Id.* at 847.

[9] The Wechsler Intelligence Scales are "a series of standardized tests used to evaluate cognitive abilities and intellectual abilities in children and adults."  THE FREE DICTIONARY, *http://medical-dictionary.thefreedictionary.com*. After the appropriate test is given, "Verbal and Performance IQs are scored based on the results of the testing, and then a composite Full Scale IQ score is computed."  *Id.*

score of 48, and a full-scale score of 45.  (*Id.*).  The WAIS-III classifies these scores as "extremely low."  (*Id.*).  Dr. Ryan reported that such scores suggest "functioning in the range of moderate mental retardation."  (*Id.*).  Dr. Ryan gave Knox three other cognitive tests, and the results were consistent with the results from the WAIS-III.  (Tr. at 248).  He then diagnosed Knox as suffering from an "adjustment disorder[10] with mixed disturbance of emotions and conduct, chronic"; a "cognitive disorder"; and "moderate mental retardation, provisional."  (Tr. at 249).  He also noted that "neuropsychological screening results were indicative of possible cognitive deficits/organic dysfunction."  (Tr. at 248-49).  Dr. Ryan gave Plaintiff a Global Assessment of Functioning ("GAF") score of 50.[11]  (Tr. at 249).  He then reported that it was "unlikely that Mr. Knox's mental problems will resolve at this time."  (*Id.*).  Dr. Ryan concluded his report by stating that Knox was unlikely "to understand the meaning of filing for benefits," and that he would be "unable to manage benefit payments in his own best interest."  (*Id.*).

On May 18, 2005, Dr. Donald Gibson, II ("Dr. Gibson"), an internist, performed a consultative examination on behalf of the state.  (Tr. at 250-51).  Dr. Gibson observed that Knox was "[a] pleasant man in no apparent distress."  (Tr. at 250).  However, he also noted that Knox was not "oriented," that he "could not engage in conversation," and that he "was extremely paranoid and probably in [a] semi delusional state."  (Tr. at 251).  Dr. Gibson diagnosed Knox as suffering from

---

[10] An "adjustment disorder" is defined as "a temporary disorder of varying severity that occurs as an acute reaction to overwhelming stress in persons of any age who have no apparent underlying mental disorders."  MOSBY'S at 41.

[11] The GAF scale is used to rate "overall psychological functioning on a scale of 1-100," with 100 representing "superior functioning."  AMERICAN PSYCHIATRIC INSTITUTE, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS ("DSM-IV") 32 (4th ed. 1994).  A GAF score of 41-50 indicates "serious symptoms (*e.g.*, suicidal ideation, severe obsessional rituals, frequent shoplifting) OR moderate difficulty in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job)."  *Id.* at 34.

bipolar disorder and from paranoid schizophrenia, both of which he characterized as "severe." (*Id*.).

He also diagnosed him as suffering from apparent seizures, and he elaborated, as follows:

> The patient has unconfirmed seizure activity.  It appears to be major with tonic clonic activity, tongue biting, and urinary incontinence.  The patient's seizure frequency is at least once per week, which prohibits him from working or driving.  The patient's seizure history was taken from a family member who has witnessed seizures in the past.  It is not clear if the patient is always compliant with his medication.

(*Id*.).

On June 21, 2005, Dr. Robert White ("Dr. White"), a psychologist, completed a psychiatric review technique form ("PRTF") for the state.  (Tr. at 253-66).  Dr. White never met with Plaintiff, and his review was based on medical records from the alleged onset date through the date of his evaluation.  (Tr. at 253).  Dr. White determined from the records that there was insufficient evidence to establish that Knox had any "medically determinable impairment," but he added that, "[d]ue to the limitations [and] extreme symptoms reported," he suspected "malingering."  (Tr. at 253, 265).  For that reason, he referred the case to the Cooperative Disability Investigations Unit ("CDI"), which investigates suspected benefits fraud.  (*See* Tr. at 175-89).

In July, 2005, an investigation of Knox was, in fact, commenced, by the Houston division of the CDI.  (*Id*.).  The stated reason for the investigation was that Knox's petition to reconsider the decision denying him benefits included a new claim of depression, but there were no medical records that showed a history of mental impairments.  (Tr. at 176).  CDI investigators Von Coleman ("Coleman") and David Ritchie ("Ritchie") (collectively, "the investigators") gathered evidence, including medical records which showed that Knox had been diagnosed as suffering from mental disorders.  (Tr. at180-82).  They also purportedly observed Knox "drive[] his mother's pickup truck to collect aluminum cans and visit his three daughters at their schools."  (Tr. at 182).  In addition,

they reportedly witnessed him "follow along in conversation, answer questions, read, and write."

(Tr. at 182).  During the investigation, which lasted for approximately three months, Coleman

discovered that Knox was arrested on September 20, 2005, for driving with a suspended license.

(Tr. at 183).  On October 12, 2005, Coleman and Ritchie met with Knox, on the pretext that they

were investigating a theft ring and believed Plaintiff might have information relating to the case.

(*Id*.).  When Knox said that he had no information, Ritchie told him "that in order for him to prove

he was not the person we were looking for[, we] he needed to know what kind of person he is."

(*Id*.).  Knox agreed to answer the investigators' questions.  (Tr. at 183-84).  During the interview,

Coleman and Ritchie were able to engage Knox in conversation, and to guide him through reviewing

fake "photo spreads."  (Tr. at 184-85).  The investigators noted that Knox was able to respond to

questions and to follow directions appropriately.  (Tr. at 184).  However, Ritchie found that Knox,

in fact, was unable to read.  (*Id*.).  On October 21, 2005, Coleman and Ritchie submitted a report of

their investigation, along with evidence that included "covert photos" and a "covert videotape."  (Tr.

at 187-89).  The report became part of the administrative record, but it appears that the matter was

not pursued after the SSA denied Knox's petition for reconsideration.  (*See* Tr. at 85-89, 175-89,

471, 480).

On July 8, 2005, Knox took a urine test which was negative for non-therapeutic drugs.  (Tr.

at 378).  On August 2, 2005, he went to Ben Taub with the following complaint:  "I'm depressed

and I need help."  (Tr. at 370).  Knox also stated that he is afraid that people will hurt him, that he

has heard voices for the past ten years that tell him to harm himself or others, and that he had

attempted suicide twice in the past.  (*Id*.).  He was given a urine drug screen, and the results were

positive for opiates, benzodiazepine, and cocaine.  (Tr. at 371).  Knox's diagnosis was said to be

"cocaine abuse," as well as a seizure disorder and hepatitis C.  (*Id.*).  On that date, he was given a

GAF score of 60,[12] and was reported to make poor eye contact, to have slow motor skills, to use slow

and deliberate speech, to be disoriented as to time, to have a "flat" affect, and to be in a "down"

mood.  (*Id.*).  The next day, a doctor, whose signature is illegible, wrote that, although Knox initially

denied cocaine use, he admitted it when he learned of the positive drug test result.  (Tr. at 368-69).

The doctor reported that Knox was not in imminent danger of harming himself or others, and did

not need hospitalization.  (Tr. at 368).  He referred Knox for a drug rehabilitation consult.  (*Id.*).

On October 28, 2005, Dr. Michele Chappuis ("Dr. Chappuis"), a psychologist, completed

a PRTF on behalf of the state.  (Tr. at 275-88).  She appears to have based her opinion on the

medical records and on the report from the CDI investigation.  (Tr. at 287).  Dr. Chappuis concluded

that Knox had not shown that he suffers from a medically determinable impairment.  (Tr. at 275).

She explained her conclusion in the following paragraph, which she supports with the results of the

CDI investigation:

> Evidence in file notes that claimant is able to repair cars, is able to drive and drives
> to his childrens [sic] elementary and middle schools twice a week to visit.  Claimant
> has earned [substantial gainful activity] in the past.  Claimant is able to recall his date
> of birth and his social security number.  Claimant has seven children.  Exam dated
> 5/05 notes that claimant is delusional and could not be engaged in conversation.
> Claimant could not give his birthdate, name, or any other information.   This
> information had to be provided by another family member.  Other evidence in the file
> contradicts such a claim.  The medical evidence from the TS Dr. Ravichandran[13] and
> the CES by Dr. Gibson and Dr. Ryan has [sic] minimal adjudicative value because
> the content therein is not credible; the legal evidence . . . demonstrates no objective

---

[12] A GAF score of 51-60 indicates "[m]oderate symptoms (*e.g.*, flat affect and circumstantial speech, occasional panic attacks), or moderate difficulty in social, occupational, or school functioning (*e.g.*, few friends, conflicts with peers or co-workers)."  *Id.*

[13] The court assumes that the transcript contains records by Dr. Ravichandran, but the signatures on many of the medical records are illegible.

evidence to support any mental [medically determinable impairment] and no
significant limitations.

(Tr. at 287).

The next relevant records show that, on August 1, 2006, Knox went to his first

psychotherapy appointment at Ben Taub. (Tr. at 359). He was seen by Lisa Marie McCarren ("Ms.

McCarren"), a psychotherapist, who reported that Knox had auditory hallucinations, in the form of

voices, as well as communication and memory problems. (*Id*.). Knox informed her that he had

previously attempted suicide, but that he could not remember when. (*Id*.). Knox also reported that

he was alcohol dependent, and that he had a history of substance abuse, including crack cocaine

dependence. (*Id*.). At his next appointment, on August 21, 2006, Knox still claimed to be

experiencing auditory hallucinations, but this time he described the voices as saying, "Hey you," and

of speaking in whispers whenever "[he] feel[s] like something [is] going to happen." (Tr. at 358).

He also informed Ms. McCarren that he was having trouble sleeping, and that he could not read or

write. (*Id*.). Ms. McCarren reported that Knox had an "odd affect," and appeared to be confused.

(Tr. at 358-59).

On November 6, 2006, Knox saw psychiatrist Stephanie Sim, at Quentin Mease Community

Hospital, for a follow-up psychiatric examination. (Tr. at 392). While waiting for that appointment,

Knox complained of chest pain. (*Id*.). He was seen by Dr. Le'Chauncy Woodard ("Dr. Woodard"),

an internist, who reported that the chest pain had been sharp but very short lived. (Tr. at 391). Knox

told Dr. Woodard that the pain in his chest seemed to be related to the anxiety that he had been

feeling at the time. (*Id*.). Later that day, Knox saw Dr. Sim, who diagnosed him as suffering from

psychosis, depression, and mild seizures, along with high blood pressure. (Tr. at 14, 393). On

February 6, 2007, Dr. Wafaa Farag ("Dr. Farag"), a psychiatrist, evaluated Knox, and found, as follows:

> The patient is suffering from psychosis due to brain injury.  The patient is unable to hold a conversation.

(Tr. at 347).   On February 12, 2007, Knox had another appointment with Dr. Sim, and she diagnosed him as suffering from a "psychotic disorder NOS (atypical psychosis)."  (Tr. at 190-91). She prescribed Seroquel, an anti-psychotic medication.  (*Id*.).  Dr. Sim also noted that Knox's "condition has deteriorated and would benefit from hospitalization."  (Tr. at 316).  On the same day, Dr. Sim wrote a letter, presumably addressed to the SSA, in which she stated that she had been treating Knox "on a 3 month basis since August 2006," for symptoms of psychosis.  (Tr. at 297). In that letter, she contended that, due to his mental illness, as well as his medication, Knox "is unable to work at this time."  (*Id*.).

On February 13, 2007, on the same day he testified at the first hearing, Dr. Giao Hoang submitted written answers to interrogatories that had been propounded by the ALJ.  (Tr. at 299-309). In that document, Dr. Hoang reported that there was sufficient evidence to support the claim that Knox suffered from seizures.  (Tr. at 307).  He also found, however, that the evidence did not support a conclusion that Knox's seizure disorder satisfied the requirements of any of the listed impairments.  (*Id*.).  But Dr. Hoang noted that there was medical evidence to support Knox's complaints of heat stroke, hepatitis C, depression, and anxiety.  (Tr. at 308-09).

On February 21, 2007, Knox voluntarily presented himself for admission to the Harris County Psychiatric Center ("HCPC"), where he stayed for one week under the care of Dr. Adel Wassef ("Dr. Wassef"), a psychiatrist.  (Tr. at 321-31).  On the day he was admitted, Dr. James Nelson ("Dr. Nelson") evaluated Knox, following an interview and a review of hospital records.

(Tr. at 327-30).  Dr. Nelson reported that Knox's chief complaint was the following:  "I've been hearing voices to hurt people."  (Tr. at 327).  Knox informed Dr. Nelson that he "was scared of listening to the voices," and that he was considering suicide by cutting his neck.  (*Id.*).  He denied having homicidal ideations.  (*Id.*).  Dr. Nelson noted that, on admission, Knox told a unit nurse that he should not be given a roommate because he might hurt him.  (*Id.*).  Dr. Nelson noted that Knox "appeared to be a poor historian or was unwilling to provide clear details" about his condition.  (*Id.*).  Dr. Nelson also reported that, when asked about his cocaine abuse, Knox replied, "[W]ell, if that's what they said I had, I guess I did."  (*Id.*).  Dr. Nelson observed that Knox had a disheveled and unkempt appearance, that he was difficult to engage, that he maintained poor eye contact, and that he appeared to have slow psychomotor activity.  (Tr. at 328-29).  He reported that Knox's speech was slow, but normal in volume, that his thought process was "logical, directed, concrete," that his insight and judgment were poor, and that he was oriented to person and place, but not to time, as he stated that it was January 2006.  (Tr. at 329).  He found that Knox's mood was depressed and his affect constricted.  (*Id.*).  Dr. Nelson also observed that Knox was alert, well nourished, and generally appeared to be in good physical health.  (*Id.*).

Dr. Wassef gave Knox a GAF score, at the time of admission, of 25.[14]  (Tr. at 325).  At discharge, Dr. Wassef completed a "Comprehensive Discharge Summary," in which he reported that Knox's blood test results were normal, but that the urine drug screen, performed on admission, had been positive for cocaine.  (Tr. at 324-25).  Dr. Wassef reported that, during his stay, Knox followed staff directions, participated in group therapy, and was compliant with his medication regimen.  (*Id.*).

---

[14] A GAF score of 25 indicates that the person is experiencing a "serious impairment in communication or judgment . . . or [an] inability to function in almost all areas."  DSM-IV at 34.

18

In addition, Dr. Wassef stated that Knox did not act aggressively, and that he became less preoccupied with hallucinations, delusions, and suicidal thoughts. (Tr. at 325). Dr. Wassef reported that, by the time of discharge, Knox had shown an effective response to his treatment, and "felt better, calmer, interactive, [and] pleasant." (*Id*.). Dr. Wassef diagnosed Knox as suffering from an "adjustment disorder w/mixed disturbance of emotions and cond[uct]," "mental retardation severity unspecified," epilepsy, hepatitis C, and hypertension. (*Id*.). He also found that Knox's GAF score had risen to 45.[15] (*Id*.). Dr. Wassef instructed Knox to follow up with Dr. Sim and to attend an outpatient rehabilitation program. (*Id*.).

On March 5, 2007, Knox had a follow up appointment with Dr. Sim, who found him to be alert and generally oriented, to maintain good eye contact, and to exhibit no motor abnormalities. (Tr. at 311). She also noted that Knox claimed to have no suicidal or homicidal thoughts. (*Id*.). However, Dr. Sim reported that Knox was having difficulty sleeping, and that his "concentration [was] slow." (*Id*.). In addition, she characterized Knox's mood and affect as "constricted." (*Id*.). She further noted that Knox claimed to once again be experiencing auditory hallucinations and paranoid delusions. (*Id*.). Dr. Sim diagnosed Knox as suffering from "psychosis NOS" and "MDD with psychoti[c] features," and she ascribed a GAF score of 49[16] to him. (*Id*.).

On July 26, 2007, before testifying at the second hearing, Dr. Daniel Hamill, a psychologist, submitted a PRTF regarding Knox's condition. (Tr. at 413-24). On that form, Dr. Hamill noted that

---

[15] A GAF score of 45 may indicate "serious symptoms (*e.g.*, suicidal ideation, severe obsessional rituals, frequent shoplifting) OR moderate difficulty in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job)." *Id*.

[16] A GAF score of 49 indicates "serious symptoms (*e.g.*, suicidal ideation, severe obsessional rituals, frequent shoplifting) OR moderate difficulty in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job)." *Id*.

Knox's impairments medically equal the requirements for Listing 12.03, which covers "schizophrenic, paranoid and other psychotic disorders," because he exhibited "psychotic features and deterioration that are persistent," as evidenced by "catatonic or other grossly disorganized behavior." (Tr. at 413, 415). He also found that Knox's condition medically equals the requirements for Listing 12.09, which addresses "substance addiction disorders." (Tr. at 413, 421). However, Dr. Hamill determined that Knox's condition did not satisfy the requirements of Listing 12.05, which addresses mental retardation, although he noted that he suffered from "probable" borderline intellectual functioning. (Tr. at 417). In rating Knox's functional limitations, Dr. Hamill found that Plaintiff was mildly to moderately restricted in his daily activities. (Tr. at 423). He also determined that Knox was moderately to markedly limited in terms of his ability to maintain social functioning and to maintain concentration, persistence, and pace. (*Id*.). In addition, Dr. Hamill found that Knox had suffered repeated episodes of decompensation. (*Id*.). On the same day, Dr. Hamill gave the ALJ a completed "Medical Source Statement of Ability to Do Work-Related Activities (Mental)." (Tr. at 425-27). In that document, Dr. Hamill reported that Knox was mildly to moderately limited in his ability to understand, remember, and carry out simple instructions, and in his "ability to make judgments on simple work-related decisions." (Tr. at 425). He also found that Knox was moderately to markedly limited in his ability to understand, remember, and carry out complex instructions, and in his "ability to make judgments on complex work-related decisions." (*Id*.). In addition, Dr. Hamill determined that Knox was mildly to markedly limited in his ability to interact appropriately with supervisors and co-workers, and in his ability to "[r]espond appropriately to usual work situations and to changes in a routine work setting." (Tr. at 426). Dr. Hamill further

found that Knox was moderately to markedly limited in his ability to interact appropriately with the public.  (*Id.*).

On October 29, 2007, Dr. Sim wrote another letter to the SSA about Knox's condition.  (Tr. at  428).  In that letter, Dr. Sim stated that, in her "best medical opinion" as one of his treating physicians,

> [Knox] is totally disabled without consideration of any past or present drug and/or alcohol use.

(*Id.*).  She concluded by stating that, "[d]rug and/or alcohol use is not a material cause of this individual's disability."  (*Id.*).

### *Educational Background, Work History, and Present Age*

At both of his hearings, Knox was 41 years of age, and had a seventh-grade education.  (Tr. at 26).  His past relevant work was as a metal processor.  (*Id.*).

### *Subjective Complaints*

In his applications for DIB and SSI benefits, Plaintiff claimed that he has been unable to work since August 1, 2004, because he suffers from "heat strokes."  (107, 110, 146-47).  He explained that, as a result, the following occurs:

> I start sweating and I get nervous.  My legs and knees start swelling.  I get dizzy and rods are like shooting through my head.

(Tr. at 147).  He also stated that he takes prescribed medication for arthritis pain, general pain, and muscle spasms.  (Tr. at 150-51).  He denied that he had ever been treated for emotional or mental problems.   (Tr. at 148).   Along with his applications, Knox completed a Daily Activity Questionnaire.  (Tr. at 136-37).  He stated that he spends the average day watching television, and

that he cannot do anything for exercise because he would "get overheated and fall out."  (Tr. at 136).

He also stated that stress and "heated areas" aggravate his condition.  (*Id*.).

Approximately six months after completing the first questionnaire, Knox submitted additional daily activity questionnaires relating to both physical and mental limitations.  (Tr. at 153-58).  In those questionnaires, Knox stated that he suffered from arthritis, bipolar disorder, a seizure disorder, and an anxiety disorder.  (Tr. at 153-55).  He claimed to have suffered a head injury sometime in his past that resulted in "organic brain syndrome."  (Tr. at 153-55).  Knox also stated that, on an average day, he stays at home, often in bed, but that he no longer watches television "because demons [are] in the TV."  (Tr. at 153-54, 156).  Knox added that he hears "voices" that sometimes tell him to hurt himself or others; that he has difficulty with his short-term memory; that he is often confused; and that his judgment becomes "clouded."  (Tr. at 154, 156-57).  He further stated that, when he feels stress, he might lock himself in the bathroom or his bedroom, and that when he feels that someone is criticizing him or ordering him around, he might yell or become aggressive.  (Tr. at 157-58).  He made the following statement, as well:

> my emotional, mental problems get worst at times when people mess with my stuff or just plain agessive [sic] me.  I just want to be left alone at [that] time.

(Tr. at 158).  Knox claimed that he had received treatment for his mental condition from a psychiatrist, Dr. Ravichandran.  (Tr. at 155).  On January 4, 2007, prior to the initial hearing, Knox completed a supplemental disability report, in which he claimed that he suffered from seizures, "slight strokes," bipolar disorder, schizophrenia, high blood pressure, and hepatitis C.  (Tr. at 168-74).  In that report, he stated that his daily activities had not changed, except that he "only takes baths because [he] can't stand in the shower because medicine makes [him] drowsy."  (Tr. at 172).

At both hearings, Plaintiff testified about his condition, although he appeared to have difficulty remembering significant details.[17]   At the first hearing, Knox testified that he did not remember whether he worked at all the year he claims to have become disabled.  (Tr. at 433).  He also testified that he did not remember whether he had performed any work since, nor could he explain why there were records indicating that he had earned approximately $12,000 in 2005.  (Tr. at 439, 458).

At the second hearing, Knox offered additional testimony, as follows:

Q        What is it that's keeping you from working?

                                    *     *     *

A        I get sick.

Q        It's what?

A        Because I get sick.

Q        You get sick?  How do you get sick?

A        I start cramping, and I get really dizzy.

Q        Where do you start cramping?  What part of your body cramps?

A        My whole side and on the inside.

(Tr. at 467).  The only other testimony Knox gave was in response to questions about the fraud investigation.  (Tr. at 471-72).  He claimed to remember very little about it, as shown in the

---

[17] Although Knox gave some testimony in his own behalf, several of the questions the ALJ asked him were answered by Ms. Lewis, instead.  (*See, e.g.*, Tr. at 433, 441-42, 471).  Many of Knox's answers were non-responsive, or, "I don't remember," or, "I don't know."  (*See, e.g.*, Tr. at 433, 439-40, 471-72).  Ms. Lewis also offered testimony as a witness to Knox's situation.  (Tr. at 431, 457).

following exchange:

> Q      Well, you know they conducted a, a fraud investigation of you.  And this was
> back in 2005 when the, when the investigator went out and talked to you.  Basically,
> he didn't say that you acted the same way you're acting right now.  Do you want to
> try and explain that Mr. Knox? . . .
>
> A      I don't know what you [sic] talking about.
>
> Q      Okay.  You don't remember talking to an investigator?  This was back in
> October of 2005?
>
> A      Came to my mom's house?  Two people?
>
> Q      What's your question now?  His name is David Ritchie.  . . .
>
> *   *   *
>
> A      I think I was on my, on my medicines.
>
> Q      You were what?
>
> A      I was on my medicine when, when [I] think them [sic] people came.
>
> Q      And so everything was a lot clearer then or . . . [y]ou were able to -- talk [to]
> him all right then?  So, so are you on your medicine now?
>
> A      Yeah.
>
> Q      So you should be better now than you were back then, right?
>
> A      No.
>
> Q      Uh-huh.  But you're not better.

(Tr. at 471-72).  Knox did not offer further testimony.

### *Lay Witness Testimony*

At both hearings, Bernitha Lewis offered testimony as a lay witness.  At the first hearing,

Ms. Lewis identified herself as a family friend.  (Tr. at 434).  She testified that, as a teenager, Knox

was hit by a truck while attempting to cross a highway, and "it messed up his brains."  (Tr. at 433-

34).  She testified that she is aware of Knox's situation because she used to take care of him while

24

his mother worked a night shift.  (Tr. at 434-42).  She also testified that, approximately one month before the hearing, she allowed Knox to move into her home, and that she continues to care for him. (*Id*.).  Ms. Lewis testified that she does this out of concern for Knox's well-being, but that his mother sometimes paid her for her help.  (*Id*.).  Ms. Lewis testified that Knox has "tried to work," but that every time he would do a job, he would have up to three "slight strokes," and would have to be taken to the hospital.  (Tr. at 434).  She also testified that Knox had been having trouble working, due to these "strokes," as early as 1988.  (Tr. at 435).  When asked about the $12,000 Knox allegedly earned in 2005, Ms. Lewis testified that, as far as she knew, "[h]e didn't do anything [that] year, he tried to work, but he couldn't."  (Tr. at 435, 440-43).  She admitted, however, that she had not seen Knox during the day that year, and that her belief that he had not worked stemmed from conversations she had with his mother.  (Tr. at 440-43).

Ms. Lewis also testified at the second hearing.  She told the ALJ that, in addition to caring for Knox, she has a full-time job, and four children to care for.  (Tr. at 465, 475).  Ms. Lewis repeated that she takes care of Knox because she feels sorry for him, and that she does not get paid. (Tr. at 460).  She described a typical day with Knox as follows:

> A       I see [Knox] during the morning, afternoon, evening.  I don't go to work until four.  And it's somebody, after I leave, someone comes there to watch my children and watch Mr. Knox while I'm at work.
>
> Q       So you work from four until when?
>
> A       One o'clock in the morning.  I make sure his, he gets breakfast, lunch and dinner.  I make sure all his meds, I make sure he get[s] all his medicine before I leave.  And, if he need[s] like snacks or whatever, that's when my oldest daughter come in and watch my children and watch Mr. Knox for me, because he can't be left alone at all.  I, I can't leave him for a second, that's why I'm, needed the job. . . . [A]nd my daughter agreed to come in and help . . . to make sure he's, you know, watched and kept away from my kids so he can't harm hisself [sic] or my children or anybody else.

25

(Tr. at 475-76).  When the ALJ asked Ms. Lewis why she thinks Knox should get disability benefits,

she made the following statement:

> I think he should get disability because he's, because his [sic] illness.  And he's a,
> Mr. Knox is a hard person to just try to take care of.  And, I think he should get
> disability because of his ADHD and his psychotic [sic] because I have problems with
> him when I'm not home.  He tr[ied] to hurt me, my kids, and that's a whole lot to,
> for me you know to take on.  I'm trying to take care of him, juggle my own kids, and
> trying to keep, you know, him safe, and plus me and my kids.  I'm trying to make
> sure my kids are safe . . .

(Tr. at 472).

> Ms. Lewis also testified about Knox's condition, as follows:

> He can't comprehend that well.  He has like, he has, the doctor diagnosed him with
> psychotic [sic].  And he has ADHD.  And he has seizures.  I mean he has seizures
> like frequently.  If I don't give him his medicine, he'll have like one or two or three
> back to back.
>
> *   *   *
>
> . . . I have to put him on a schedule to make sure he takes his seizure medicine, his
> blood pressure medicine, his schizophrenic medicine, his ADHD medicine.
>
>     I have to give him all that so he can be on a mellow level where he can be,
> so I can control him and I can do what I have to do and go about my daily business.
> He doesn't know really sometimes what he's taking the medicine for.  I try to explain
> to him when we go to the doctor what's wrong with [him], what the doctor tells
> [him], you know, what's wrong with [him], and what [he's] taking the medicine for.

(Tr. at 467-68).  She further testified that she takes Knox to his doctor's appointments approximately

once a month.  (Tr. at 468).  However, Ms. Lewis testified that Knox had not been to any doctor

recently, because she had inadvertently let his benefits card expire, but that he continued to get his

medication.  (Tr. at 468, 478-79).  Regarding drug abuse, she stated that, as far as she knows, Knox

has not used illegal drugs since approximately 2005 or 2006, when she "told him you can't mix

drugs with this kind of medication because you can kill yourself."  (Tr. at 485).

### *Expert Testimony*

At the hearing in February, 2007, the ALJ heard testimony from Dr. Giao Hoang, an internist, and Kate Gilreath, a vocational expert. (Tr. at 430). Dr. Hoang testified primarily about Knox's physical impairments. (Tr. at 443-47). Based on the testimony and the medical evidence in the record, Dr. Hoang testified that Knox "has a history of seizures," for which he takes Tegretol. (Tr. at 443). However, he stated that "we have absolutely no documentation about the frequency of those seizures" aside from Knox's own statements. (Tr. at 444). Dr. Hoang also testified that, based on evidence that Knox "has a positive antibody to Hepatitis C," he has that disease, although "he's not having the severe symptoms of the disease." (*Id*.). In addition, Dr. Hoang testified that Knox suffers from hypertension, but that he takes medication for that condition, as well. (*Id*.). He also acknowledged that Knox had been diagnosed as suffering from an adjustment disorder and from "moderate mental retardation." (Tr. at 445). Dr. Hoang testified, however, that none of Knox's impairments meets or equals any of the impairments listed in the regulations that govern the SSA. (*Id*.). Dr. Hoang testified that Knox can do work that requires a medium level of exertion, provided that he not climb ropes or ladders, and that he avoids "unprotected height[s]" and moving machinery, because of his seizure disorder. (Tr. at 445-46).

At the second hearing, the ALJ heard testimony from Dr. Daniel Hamill, a clinical psychologist. (Tr. at 479-86). Dr. Hamill based his opinions on the records and the hearing testimony, and he referred to the PRTF that he had completed prior to the hearing. (Tr. at 479-80). Dr. Hamill testified that Knox suffered from psychosis, "probable borderline intellectual functioning," and "polysubstance dependence," and that, in combination, these impairments would likely "equal" Listing 12.03. (Tr. at 480). On the other hand, he testified that the IQ scores in the

file are not credible, and that the record does not support "a[ mental retardation] case." (Tr. at 480, 482). Dr. Hamill testified that a disability finding based on mental retardation would be inconsistent with the medical records and the findings from the fraud investigation, as well as the earnings statements from 2005. (Tr. at 480, 482). Next, Dr. Hamill addressed the issue of Knox's history of drug and alcohol abuse. (Tr. at 480). He stated, "I don't think drugs and alcohol are the whole story here," but testified that "they are certainly material to the severity" of his other conditions. (Tr. at 480-81). Dr. Hamill concluded that, if Knox did not have a substance abuse problem, his remaining impairments, alone or in combination, would not meet or equal the requirements for any of the listings. (Tr. at 481). He elaborated, as follows:

> A    I'm saying that it's clear to me that he does have some problems, and they're affecting his conduct, . . . and how he functions. But he keeps shooting himself in the foot with drugs and alcohol, which suborn his treatment.
>
> *    *    *
>
> Q    Okay. So if he stopped using drugs and alcohol, then does this mean that his condition would get better or would it get worse or stay the same?
>
> A    It would get better, but he would still have some problems.

(Tr. at 483). Dr. Hamill stated that Knox's problems include a "moderate impairment in understanding and remembering complex instructions [and in] carrying out complex instructions," as well as a moderate impairment in making judgments "on complex work instructions." (Tr. at 484). He also testified that Knox would "still have a moderate impairment in interacting appropriately with the public." (*Id*.). He further testified, however, that any other impairments Knox suffers from would be "mild" if he stopped using drugs. (*Id*.).

Finally, the ALJ heard testimony from Ms. Swisher, the vocational expert. (Tr. at 486-95). The ALJ posed hypothetical questions to her, based on the physical RFC assessment from Dr. Hoang. (Tr. at 489). Ms. Swisher testified that, based on Dr. Hoang's assessment, Knox would be

able to do work that requires a medium level of exertion, with "seizure restrictions in that he couldn't climb ladders and scaffolds."  (Tr. at 489-90).  The ALJ then asked Ms. Swisher to consider, as well, the mental RFC assessment from Dr. Hamill.  (Tr. at 491).  In that assessment, which took into account any limitation attributed to substance abuse, Dr. Hamill found Knox to be moderately to markedly limited in terms of his ability to maintain social functioning and to maintain concentration, persistence, and pace.  (Tr. at 423).  Ms. Swisher testified that, with such limitations, Knox would be unable to work.  (Tr. at 491-92).  The ALJ then asked Ms. Swisher to consider the same limitations, absent those attributed to substance abuse.  (Tr. at 492).  Ms. Swisher testified that Knox would still be incapable of performing his past work as a metal processor, however, he would be capable of work that required only a light to medium level of exertion.  (Tr. at 491-93).  She identified jobs as a "hand packager," "laundry worker," "hospital cleaner," and "assembler," and stated that such jobs were available in significant numbers in the national economy.  (*Id*.).

### *The ALJ's Decision*

Following the hearing, the ALJ made written findings on the evidence.  From his review of the record, he determined that Knox suffers from "a seizure disorder, schizophrenia, and a substance abuse disorder," and that those impairments are "severe."  (Tr. at 27).  He also found that Knox's impairments, including the substance abuse disorder, "medically equal" the condition described in

Listing 12.03 of the governing regulations.  (*Id*.).  He summarized that Listing as follows:

> Listing 12.03 deals with schizophrenia, paranoid and other psychotic disorders with the persistence of delusions, hallucinations, catatonic behavior, incoherence, or emotion[al] withdrawal, resulting in marked functional limitations.

29

(*Id.*). The ALJ further found that, without substance abuse, Knox's other impairments would remain

severe. (Tr. at 28). But he ultimately determined that, if Knox stopped abusing drugs and alcohol,

his impairments or combination of impairments would not meet or equal Listing 12.03. (*Id.*). The

ALJ then found that Knox is unable to perform his past work as a metal processor, because he can

no longer handle a heavy level of exertion. (Tr. at 33). He then made the following finding:

> If the claimant stopped the substance use, the claimant would have the residual
> functional capacity to perform medium work except that he has moderate limitations
> in the ability to understand, remember, and carry out complex instructions and to
> interact appropriately with the public.

(Tr. at 29). The ALJ concluded that there are "a significant number of jobs in the national economy

that the claimant could perform," if he stops abusing substances, including work as a "hand

packager," a "laundry worker in a hotel or nursing home," a "hospital cleaner," or an "assembler."

(Tr. at 28, 34). Ultimately, the ALJ reached the following conclusion:

> Because the claimant would not be disabled if he stopped the substance use (20 CFR
> 404.1520(g) and 416.920(g)), the claimant's substance use disorder[] is a
> contributing factor material to the determination of disability (20 CFR 404.1535 and
> 416.935). Thus, the claimant has not been disabled within the meaning of the Social
> Security Act at any time from the alleged onset date through the date of this decision.

(Tr. at 34). With that decision, he denied Knox's applications for disability insurance benefits and

for supplemental security income. (Tr. at 35). That denial prompted Plaintiff's request for judicial

review.

It is well settled that judicial review of the Commissioner's decision is limited to a

determination of whether it is supported by substantial evidence, and whether the ALJ applied the

proper legal standards in making it. *See Myers*, 238 F.3d at 619; *Newton*, 209 F.3d at 452 (citing

*Brown*, 192 F.3d at 496). Any conflict in the evidence is to be resolved by the ALJ, and not the

court. *See id*. A finding of "no substantial evidence" is proper only if there are no credible medical

findings or evidentiary choices that support the ALJ's decision.  *See Johnson*, 864 F.2d at 343-44

(quoting *Hames*, 707 F.2d at 164).

As a threshold matter, because Knox was not represented by an attorney until after the ALJ

issued his written decision, he is entitled to some deference.  *See Castillo v. Barnhart*, 325 F.3d 550,

552-53 (5th Cir. 2003).  The court applies "less stringent standards to parties proceeding *pro se* than

to parties represented by counsel."  *Sanders v. Barnhart*, 105 Fed. Appx. 535, 536 (5th Cir. 2004)

(citing *Grant v. Cuellar*, 59 F.3d 523, 524 (5th Cir. 1995); *Yohey v. Collins*, 985 F.2d 222, 225 (5th

Cir.1993)); *accord Johnson v. Quarterman*, 479 F.3d 358, 359 (5th Cir. 2007).  The Fifth Circuit

has made clear that when a social security claimant is not represented by counsel at the hearing, "the

ALJ [i]s under a heightened duty to scrupulously and conscientiously explore all relevant facts."

*Castillo*, 325 F.3d at 552-53 (citing *Brock v. Chater*, 84 F.3d 726, 728 (5th Cir. 1996)).  Here, then,

the ALJ had a heightened duty to examine and develop the record before he made a decision on

Knox's claim for benefits.  *See id*. at 553.

### Treating Sources

Plaintiff's first complaint is that the ALJ failed to give appropriate consideration to the

opinions from his treating psychiatrist, Dr. Sim, as well as those from his other treating sources,

including the physicians and medical personnel at Ben Taub.  (Plaintiff's Motion at 6-9).  In

response, Defendant argues that Dr. Sim is not a treating source for purposes of the governing

regulations.  (Defendant's Response at 1).  In the alternative, Defendant argues that Dr. Sim's

February, 2007 statement that Knox is unable to work is unsupported and conclusory.  (*Id*. at 1-4;

*see* Tr. at 297).  Defendant's first argument is moot, because, in his decision, the ALJ acknowledges

Dr. Sim as "a treating physician."  (Tr. at 32).  Nevertheless, the regulations, in part, define a

"treating source" as a physician, psychologist, or other accepted medical practitioner with whom the claimant had or has an "ongoing treatment relationship." 20 C.F.R. § 404.1502. It is true that, in this case, Dr. Sim made the challenged statement just six months after she began treating Knox. (Tr. at 297). However, the evidence shows that Dr. Sim had examined and treated Knox for his mental impairments on three occasions, at three-month planned intervals, at the time she provided the statement. (Tr. at 190-91, 297, 316-17, 392). The evidence also shows that she had been treating Knox with medication since their first appointment. (*Id.*). The evidence further shows that Dr. Sim continued to treat Knox even after she informed the SSA that he was unable to work. (Tr. at 311-13, 428). Under these circumstances, Dr. Sim and Knox had an "ongoing treatment relationship," and she should be considered a "treating source." *See* 20 C.F.R. § 404.1502.

Defendant argues, as well, that Dr. Sim's February, 2007 statement is conclusory and not to be credited for that reason. (Defendant's Response at 2-3). It is true that the statement does not provide a wealth of supporting evidence. (*See* Tr. at 297). But Dr. Sim does state that she based her opinion on (i) what she had observed during the treatment relationship; (ii) the nature of the diagnoses; and (iii) the type and amount of medication prescribed. (*Id.*). Further, her opinion is consistent with the medical records from her examination of Knox on the same day the statement was issued. (*See* Tr. at 190-91, 316). In this context, the statement cannot be dismissed as merely conclusory. The critical issue, then, is whether the ALJ gave the proper deference to Dr. Sim's opinion.

In his decision, the ALJ refers only to Dr. Sim's February, 2007 statement that Knox cannot work. (Tr. at 32). In regard to that assessment, he made the following finding:

> In terms of opinion evidence, the statement dated February 2007 by a treating physician stated that the claimant had been seen by that individual for three months

and was diagnosed with psychosis.  He [sic] stated that the claimant was unable to
work at that time.  That statement is not accompanied by supporting evidence and
does not document a disabling condition expected to last for at least 12 months.  It
is also unclear whether or not the claimant was under the influence of drugs when
that statement was made.  Therefore, this statement carries little weight in this
decision.

(*Id.*).  The ALJ made no particular reference to any of Dr. Sim's other findings that were also part

of the record before him.  There is no dispute that the opinion of a treating physician is generally

entitled to controlling weight.  *See Wren*, 925 F.2d at 126; *Bradley v. Bowen*, 809 F.2d 1054, 1057

(5th Cir. 1987) (quoting *Oldham v. Schweiker*, 660 F.2d 1078, 1084 (5th Cir., Unit B 1981)).  The

law is clear that if "the treating physician's records are inconclusive or otherwise inadequate to

receive controlling weight," then "the ALJ must seek clarification or additional evidence from the

treating physician in accordance with 20 C.F.R. § 404.1512(e)."  *Newton*, 209 F.3d at 453.  In this

case, Dr. Sim stated that her opinion was based on her ongoing treatment of Knox, her diagnosis that

he suffers from a psychotic disorder, and the type and amount of medication he takes for his mental

condition.  (Tr. at 297).  This opinion finds support in Dr. Sim's treatment records.  It is also

consistent with the findings and diagnoses of several other medical sources who have treated,

examined, or evaluated Knox, either on an ongoing basis or as a consultant for the state.  These

physicians and other sources include Dr. Wassef, Dr. Nelson, Ms. McCarren, Dr. Farag, Dr. Ryan,

and Dr. Gibson.  (Tr. at 245-49, 250-51, 321-31, 347, 358-59).  Because the ALJ deemed Dr. Sim's

opinion to be "inadequate to receive controlling weight," he had the duty to seek clarification or

additional evidence from her before making his final decision.  *See* 20 C.F.R. § 404.1512(e);

*Newton*, 209 F.3d at 453.  Because he failed to do so, the ALJ erred in dismissing Dr. Sim's

February, 2007, statement.  *See Newton*, 209 F.3d at 453, 456.

As noted, there are medical findings by many of Knox's treating sources that are consistent with his allegations, and that are also consistent with the findings by state examining doctors.  (Tr. at 190-91, 245-49, 250-51, 311, 316, 321-31, 347, 358-59, 361).  His treating sources diagnosed Knox as suffering from mental illnesses such as schizophrenia, psychosis, depression, adjustment disorder, as well as mental retardation.  (Tr. at 190-91, 311, 316, 325, 328-29, 347, 358-59, 361). They consistently observed Knox to have a constricted, depressed, or flat mood and affect.  (*Id*.). They reported that Knox's communication skills, concentration, insight, and judgment were poor. (*Id*.).  And they observed that Knox appeared disheveled and unkempt, had slurred speech, and exhibited slow psychomotor activity.  (*Id*.).  Yet, the ALJ does not point to specific evidence that justifies his rejection of all of these findings.  Instead, he merely makes blanket statements that the findings must have been based on Knox's self-reports, or that they were not credible on the assumption that he was using drugs at the time of the examinations.  (Tr. at 27-33).

Aside from the February, 2007 opinion from Dr. Sim, the ALJ specifically addressed the opinion from only one other treating source.  (Tr. at 33).  That opinion, from Dr. Farag, consists solely of the following three sentences:

> Mr. Knox was evaluated on 2/6/07.
>
> The patient is suffering from psychosis due to brain injury.  The patient is unable to hold a conversation.

(Tr. at 347).  The ALJ failed to give controlling weight to Dr. Farag's opinion because the "statement was based on the claimant's self-reported history."  (Tr. at 33).  However, the ALJ does not cite anything to support this reason.  (*See id*.).  In fact, it is not clear that the transcript contains any other records from Dr. Farag.  Clearly, the ALJ should have sought additional information from Dr. Farag regarding the basis for his opinion.  If the ALJ believed that Dr. Farag's opinion should

34

not be given controlling weight, he must properly explain the reason for doing so.  In this case, then, the ALJ did not properly consider the opinions and findings by Knox's treating sources, as required by law.  *See* 20 C.F.R. § 404.1512(e); *Newton*, 209 F.3d at 453.

### Sufficiency of the Evidence

Plaintiff claims that the ALJ erred when he found that his impairments, absent the substance abuse disorder, did not equate to a finding of "disabled" under SSA Listing 12.03.  (Plaintiff's Motion at 6, 11-12).  He also claims that the ALJ erred because he failed to develop the record properly regarding the alleged brain injury that he believes caused his mental impairments.  (*Id*. at 6, 12-13).  In addition, Knox points to Dr. Sim's October, 2007 letter, in which she informed the Appeals Council that "[d]rug and/or alcohol use is not a material cause of [Knox's] disability," as further evidentiary support for his claims.  (*Id*.; Tr. at 428).  It is well established that, in determining whether a disability exists, an ALJ "owe[s] a duty to a claimant to develop the record fully and fairly to ensure that his decision is an informed decision based on sufficient facts."  *Brock*, 84 F.3d at 728 (5th Cir. 1996); *accord Newton*, 209 F.3d at 458.  When a claimant is proceeding without counsel, the ALJ's duty to develop the record is heightened.  *See Castillo*, 325 F.3d at 552-53.  In this case, because Knox was proceeding *pro se*, the ALJ had a heightened duty to develop the record.  *See id*. at 553.

When Knox first raised the issue of mental impairments, he claimed that he was mentally disabled as a result of depression.  (Tr. at 90).  Ultimately, the ALJ found that he suffered from severe schizophrenia, and that his mental impairments equaled the requirements of Listing 12.03. (Tr. at 27).  However, he also found that, absent drugs or alcohol, Knox's other impairments, while still severe, would no longer qualify for Listing 12.03.  (Tr. at 28).  He reached this decision, in part,

based on testimony from Dr. Hamill.  (Tr. at 28-32).  But it is clear, as well, that the ALJ made his own assumptions on whether substance abuse is a material factor in whether Knox is disabled.  (*See* Tr. at 30-33).

The ALJ interpreted the records to show that when Knox was observed to be incoherent and unresponsive, there was a contemporaneous finding that he was abusing drugs.  (*Id*.).  For instance, the ALJ points out that, in May, 2005, Dr. Ryan reported that Knox could not remember simple matters such as his age, and Dr. Gibson found that he could not "engage in conversation," and then, only three months later, a urine screen tested positive for the presence of cocaine.[18]  (Tr. at 31, 247, 251, 371).  Next, the ALJ implies that Knox's "odd" demeanor and confused state, which were observed by Ms. McCarren, were symptomatic, at least in part, of the "alcohol dependence" Knox reported to her.  (Tr. at 31, 358-59).  The ALJ further points to the fact that a drug screen taken at the psychiatric hospital proved positive for cocaine.  (Tr. at 31, 321-31).  But none of these facts raise more than an inference that Knox might have been using drugs on all of those occasions on which he was observed to have extreme symptoms of a mental impairment.  (*See* Tr. at 30-33).  And none of these calculations aid in the determination of how well Knox would function absent substance abuse.  (*See id*.).

In fact, the medical records clearly show that Knox tested positive for drugs on only two occasions.  (Tr. at 324-25, 371).  They show that he was given at least one other drug screen, but that its results were negative.  (Tr. at 378).  All other mentions of substance abuse in the medical records are Knox's own reports that he had used drugs in the past.  (*See*, *e.g.*, Tr. at 228, 237, 359).  Further, on those two occasions when Knox did test positive for drugs, his physicians nevertheless concluded

---

[18] As the ALJ himself notes, a drug screen was also taken in the interim, and the results were negative for non-therapeutic drugs.  (Tr. at 32, 378).

that his symptoms and low functioning levels were due to mental illness.  (Tr. at 324-25 [Dr. Wassef]; 371 [Ben Taub]).  In this case, there is not substantial evidence to support the ALJ's finding that, absent drug abuse, Knox's mental impairments would not qualify under the SSA Listings.  For that reason, the court concludes that the record should have been further developed on this issue.  *See Castillo*, 325 F.3d at 552-53.  At the very least the ALJ should have sought clarification from Dr. Wassef and the other Ben Taub physician on whether they believed that drug abuse was a material factor in their findings.  On remand, the ALJ should also seek additional evidence from Dr. Sim about the effects, if any, of drug abuse on Knox's abilities.

Next, in his decision, the ALJ adopted Dr. Hamill's opinion that the results of the cognitive tests administered by Dr. Ryan were not credible because they were inconsistent with the record as a whole.  (Tr. at 29-34, 480, 482).  As partial support for this finding, Dr. Hamill and the ALJ rely on the CDI investigation report, which states that Knox engaged in significant conversation with the investigators.  (Tr. at 29-34, 84-85, 480, 482).  However, nothing in Dr. Hamill's opinions or the CDI report is sufficient to support the ALJ's determination.  In fact, the only other support in the record for the ALJ's decision are the statements of Dr. White and Dr. Chappius, who never met with Knox, and who reviewed his records on behalf of the state.  (Tr. at 253-66, 275-88).  Further, none of these individuals address the fact that the results from Dr. Ryan's cognitive tests were consistent with each other and with the GAF scores assessed by many other physicians who treated Knox in that era.  (*See* Tr. at 247-49, 311, 325, 371).  It is evident, then, that the ALJ's decision to dismiss those test results which suggest that Knox has a low cognitive ability is not supported by substantial evidence.  For that reason, the record should have been further developed on this issue, as well.  *See Castillo*, 325 F.3d at 552-53.

In addition, in his decision, the ALJ did not adequately address the importance of Knox's alleged head injury, or the CT Scan results that were consistent with a Chiari type I brain malformation.  (*See* Tr. at 153-55, 221, 224, 248).  Knox contends that his head injury, which occurred when he was a teenager,  may be responsible for many of his impairments today.  (Tr. at 153-55, 224).  Similarly, a Chiari malformation type 1, which tends to reveal itself in the teenage years, may in fact contribute to many of Knox's symptoms, including the headaches, vision problems, dizziness, and slurred speech about which he consistently complains.  *See* MayoClinic.com, *http://www.mayoclinic.com/health/chiari-malformation /DS00839 /DSECTION =symptoms* (Sept. 8, 2009).  Either or both of these conditions could be a contributor to Knox's mental condition.  (Plaintiff's Motion at 12-13).  In fact, Dr. Farag, in his brief statement, contended that Knox's psychosis arose out of his head injury. (Tr. at 393).  In this case, the ALJ considered the evidence of Knox's mental impairments, and concluded that substance abuse was a material factor in determining the extent of his disability.  (Tr. at 28-35).  Logically, if Knox's mental impairments arose from a head injury or a malformation in the brain, those things should have been considered as well.  *See id*.  The record, however, contains little evidence regarding these possible sources of Knox's indisputably severe symptoms.  Because Knox was proceeding *pro se*, the ALJ had a heightened duty to "scrupulously and conscientiously explore all relevant facts."  *Castillo*, 325 F.3d at 552-53 (citing *Brock*, 84 F.3d at 728).  It is certainly relevant whether Knox's impairments are related to a head injury or a brain malformation.  For these reasons, it is clear that the ALJ should have developed the record more fully before reaching a decision regarding Knox's eligibility for benefits.  *See id*.

As the Fifth Circuit has explained, "where the rights of individuals are affected, an agency must follow its own procedures, even where the internal procedures are more rigorous than otherwise would be required." *Newton*, 209 F.3d at 459 (quoting *Hall*, 660 F.2d at 119 (5th Cir. 1981)). "If prejudice results from the violation, the result cannot stand." *Id.* In social security cases, a claimant establishes prejudice by showing that, absent the error, the ALJ might have reached a different conclusion. *See id.* at 453; *Ripley*, 67 F. 3d at 557 n.22. In this case, Knox was prejudiced, because if the ALJ had given proper consideration to his treating sources and fully developed the record as to his mental state, he may have reached a different result. *See id.* Because the ALJ failed to develop the record properly, his decision is not supported by substantial evidence, and is subject to reversal. *See Newton*, 209 F.3d at 452; *Ripley*, 67 F.3d at 557. For these reasons, this matter must be remanded, under sentence four of 42 U.S.C. 409(g), on the issue of Knox's mental impairments. On remand, the record can be developed fully, in accordance with the law, so that the ALJ can render a decision that is supported by substantial evidence. *See Newton*, 209 F.3d at 452; *Ripley*, 67 F.3d at 557.

**Conclusion**

Accordingly, it is **RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **GRANTED**, and that Defendant's Motion for Summary Judgment be **DENIED**.

It is also **RECOMMENDED** that this case be remanded for further development on the issue of Plaintiff's mental impairments, as set out in this memorandum.

The Clerk of the Court shall send copies of the memorandum and recommendation to the respective parties, who will then have ten business days to file written objections, pursuant to 28 U.S.C. § 636(b)(1)(c), General Order 02-13, S.D. Texas.  Failure to file written objections within the time period provided will bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk, P.O. Box 61010, Houston, Texas 77208; copies of any such objections shall be delivered to the chambers of Judge Lee H. Rosenthal, Room 11535, and to the chambers of the undersigned, Room 7007.

**SIGNED** at Houston, Texas, this 14th day of September, 2009.

**MARY MILLOY**
**UNITED STATES MAGISTRATE JUDGE**